**BRISTOL LABORATORIES, Inc.**
v.
**SCHENLEY LABORATORIES, Inc.**
**Civ. No. 3033.**

United States District Court
S. D. Indiana, Indianapolis Division.
Sept. 17, 1953.

Helge C. Dieserud, New York City, John P. Murphy, Skaneateles, N. Y., and Baker & Daniels, Indianapolis, Ind., for plaintiff.

John Hoxie, New York City, Donal F. McCarthy, New York City, and Charles A. Lowe, Lawrenceburg, Ind., for defendant.

STECKLER, District Judge.

The above entitled cause came on regularly for trial and the Court having duly considered the evidence, the post trial briefs filed by the parties and having heard oral arguments in support thereof; and the Court having further reviewed the exhibits covering the prior arts and being fully advised in the premises, now finds the following:

### Findings of Fact

1. This action is for infringement of certain claims of Buckwalter patent 2,-507,193, duly and legally issued on May 9, 1950 to plaintiff, a New York corporation, as assignee, which at all times since has been sole owner of the patent.

2. The patent relates to an injectable penicillin preparation and to the process for making it.

3. Plaintiff charges defendant with infringement of Claims 1–5, 7–11, 13 and 14, relating to the preparation itself, and infringement of Claims 15–17, relating to the process.

4. The product claims embrace two major concepts, each being directed primarily to the production of therapeutically effective levels of penicillin in the patient's blood stream for a prolonged period of time after intramuscular injection: (1) an injectable penicillin preparation using a gelled injectable oil vehicle, and (2) the use of "small particle" (i. e. in the range of from approximately 0.2 to approximately 50 microns) procaine penicillin in this gel. All of the product claims include the first concept with variations in scope as to the nature of the three essential ingredients: oil, gelling agent and penicillin, and also as to the amount of the gelling agent em-

ployed. Two of the product claims (9, 14) combine both concepts. The preferred form of the product employs a vegetable oil such as peanut oil gelled with 2 per cent aluminum monostearate and contains small particle procaine penicillin.

5. The process claims are directed to the procedure by which the product is manufactured and specify the particular substances brought together and the steps and conditions necessary to the proper combination of those substances to achieve the desired purpose. They differ in scope as to the penicillin incorporated, both as to type and particle size.

6. Defendant, a Delaware corporation having a plant within this District manufacturing the accused product, has denied infringement of any of the claims and contends that the patent is invalid in substance and in form, and unenforceable.

7. Jurisdiction, venue and title are not in issue. All matters relating to damages, including notice of infringement and patent marking, are reserved for consideration after judgment on the merits.

8. Penicillin was the first antibiotic of great value to medicine and has been widely employed, with dramatic success, in the treatment of many diseases. It is one of the greatest advances in medicine in the past decade.

9. Although penicillin was discovered by Fleming in England in 1928, and reported in 1929, it received but little attention for the next ten years. In 1938 the tremendous possibilities of the drug in combating infections were realized and in 1941, following cooperation between the British and American governments, doctors, scientists and pharmaceutical manufacturers, mass production of the drug began in this country. Although first supplies of the drug were reserved for use by the armed forces, by July 1943 there was a sufficient amount being produced here so that supplies could be furnished to civilians and governmental agencies for use and investigation. In May 1944 penicillin became available to certain hospitals throughout the country and by April 1945 its production had progressed to the point where it was released for unrestricted civilian sale and use.

10. It was soon found that the human body quickly disposed of penicillin. After intramuscular injection of the early forms of penicillin in water (other modes of administration such as oral, subcutaneous, intravenous and insufflation being wasteful or physiologically objectionable or otherwise less desirable), the entire dosage was rapidly absorbed and excreted within two to four hours. Thus the continuous treatment of systemic infections with these preparations required repeated and painful injections on the average of one every three to four hours throughout the course of the illness, usually necessitating hospitalization of patients, for a week for example in the treatment of syphilis, to insure their availability for the injections.

11. The need for procedures or preparations which would prolong therapeutically effective blood levels of penicillin, without the necessity for the inconvenient, painful and frequent injections, wasteful of the precious drug, was quickly recognized by all who worked with penicillin.

12. The desired prolongation of blood levels following injection was for the longest possible time, not only to avoid hospitalization, which could be obviated by a preparation providing 24-hour levels and thus permitting the treatment of ambulatory patients, but also to avoid the risk that some of the patients might not return for the subsequent necessary injections. This risk is especially significant in the case of diseases such as syphilis, and the related crippling and disfiguring diseases of pinta, bejel and yaws which affect large masses of people in various impoverished areas of the world and which, being nonvenereal in form, attack children as well as adults. The time required for penicillin to rid the system of the pathogens causing,

these diseases is longer than that required to combat most other infections and doctors prefer the maintenance of uninterrupted effective levels of penicillin in the blood for a period of from 4 to 6 days. Since these diseases are among those from which there are no known immunizations, their eradication would be thwarted by the failure of a percentage of insufficiently treated patients to return, thus leaving them to continue as carriers of the disease and as infectors and reinfectors of others. Hence, an injectable penicillin preparation which could, with one treatment, maintain effective levels for 4 to 6 days was long a goal of syphilologists and was essential to the success of any program of mass eradication of yaws, pinta and bejel in undeveloped, non-urban countries where it is difficult enough to reach the natives once, much less to induce any large proportion of those suffering from a disease to submit to a series of injections.

13. Procedures and preparations to prolong penicillin blood levels also had to meet the requirements of ease of administration and a minimum of adverse body reactions to the preparation, both systemic and at the site of injection.

14. The universally recognized need for penicillin injection procedures and preparations which would provide maximum prolongation of therapeutically effective blood levels resulted in intensive efforts by numerous investigators in the medical and pharmaceutical fields, including plaintiff, defendant and other manufacturers in this country and elsewhere, to develop means of delaying the absorption and excretion of intramuscularly injected penicillin. Also, researchers over the years had previously attempted to solve the problem of substantially prolonging effective blood levels of other drugs and their findings were promptly tried, but without significant success, in penicillin therapy.

15. Among the attempts, prior to the disclosure of Buckwalter's invention, to prolong penicillin blood levels following injection were those which sought to impede the circulation of the blood through the injection site, such as by tourniquets, ice packs and drugs which, when injected with the penicillin, constricted the blood vessels in the area; those which sought to reduce the rate of excretion of penicillin, such as by drugs which, after injection with penicillin, competed with it for excretion by the kidneys; those which changed the injection vehicle from water to emulsions and oil; those which added to the various vehicles substances such as globin, aluminum hydroxide, magnesium sulfate, protamine zinc, beeswax and pectin; and those which sought less soluble penicillin salts. Only three of these prior attempts achieved any substantial degree of penicillin blood level prolongation: "POB", an injectable preparation comprising oil, beeswax and penicillin; "POP", comprising oil, pectin and penicillin; and the development of the procaine salt of penicillin.

16. POB was first reported by Dr. Romansky in 1944 and, during the period 1945–1947, was sold in substantial quantities, using first calcium, and later sodium and potassium penicillin. This preparation kept the penicillin in a "depot" at the site of injection, releasing it relatively slowly into the patient's blood stream, and provided substantially prolonged blood levels, up to 24 hours following the standard 300,000 unit (1 cc.) injection, as compared with predecessor techniques or preparations. However, apart from its blood level prolongation, POB had a number of serious disadvantages in administration and use. In its early forms POB was so viscous at normal room temperatures that it had to be heated in the vial for some time before each withdrawal and injection, with the danger that the penicillin would be decomposed by overheating or the material made so hot as to be uncomfortable when injected. Vigorous shaking was needed to provide uniform viscosity and to resuspend particles of penicillin which had settled to the bottom of the vial on standing.

17. In 1947 a so-called "liquid" POB became available which was less viscous and of syringeable consistency and which

largely displaced "solid" POB despite the fact that it led to increased difficulties of settling, resuspension and needle plugging and still needed large, painful syringe needles.

18. Serious disadvantages were caused by the wax in POB. Both the solid and liquid forms produced certain objectionable reactions in a considerable percentage of the patients treated, these reactions including pain, hypersensitivity, lumps and sterile abscesses at the injection site, and generalized allergies, the beeswax contributing substantially to these reactions. Doctors were disturbed by the presence of beeswax in POB but they used the preparation because at the time there was no other comparable long acting penicillin injectable available. The limited blood level prolongation furnished by POB and its inconvenience in administration and adverse side reactions branded the preparation as an inadequate answer to the problem, and efforts continued to find a truly suitable penicillin injectable preparation.

19. In the latter part of 1947 and in early 1948 defendant and others were working on "POP", a preparation employing pectin in place of beeswax. Although this preparation provided 24-hour levels somewhat more consistently than did POB and resulted in a decrease in objectionable side reactions following injection, it was found unsatisfactory and was never marketed, partly because the product had a tendency to plug syringe needles and because the sterilization of pectin during production was difficult, with a consequent possibility of irritation to the patient, and because of the advent of procaine penicillin and the Buckwalter product.

20. While some of the relatively insoluble penicillin salts or their derivatives were too toxic or irritating for extensive injection use, the procaine salt of penicillin, first announced in October 1947 and first marketed in February 1948, was found to be relatively free of these objections. It was also found capable of providing, in water or oil suspensions, effective blood levels for about the same period as POB, 24 hours. Such suspensions of procaine are free-flowing liquids which handle easily in a syringe and which produce a minimum of adverse side reactions. However, the procaine settles out very rapidly and extensive and vigorous shaking is needed for resuspension. Also, considerable difficulty has been encountered at times in the use of procaine in oil or water preparations due to the clogging of the syringe needles, probably caused by the large particles of the salt which are preferred for optimum blood levels when used in water or oil alone.

21. Prior to the spring of 1948 when Buckwalter's product was announced, no commercial penicillin injectable preparation afforded more than about 24-hour blood levels/c. c., a prolongation inadequate for one-shot treatment of syphilis and related treponemal diseases, and each of the prior attempts at blood level prolongation also had disadvantages, of varying seriousness, in administration and/or use.

22. Although as early as September 1945 Buckwalter had begun thinking of the development of an improved penicillin injectable preparation, his preoccupation with other problems, such as those connected with the commercial production of POB, prevented his devoting any substantial amount of time to investigating new forms of penicillin injectables until the end of 1946 when he was finally able to embark on actual experimental work. On December 2, 1946 he put in writing for the first time what he thought were the most promising of his ideas for an improved penicillin injectable. Leading the list was the suggestion of peanut oil gelled with aluminum monostearate. Later that month a preparation comprising peanut oil gelled with aluminum monostearate and using calcium penicillin was formulated under Buckwalter's direction. Preliminary experiments with the gelled oil preparation led Buckwalter to conclude that it would provide blood levels which lasted as long as those of POB and probably somewhat longer, while avoiding

POB's administration difficulties and its adverse reactions due to beeswax.

23. The fact that aluminum monostearate is a metallic soap containing aluminum raised some question as to its suitability for injection, but Buckwalter established its safety and effectiveness through tests which he directed to be made first on animals and then on humans.

24. In developing the gelled oil preparation, Buckwalter tried various types of oil and oil equivalents as the vehicle to be gelled, gelling agents other than aluminum monostearate and variations in the amount of gelling agent.

25. During Buckwalter's experiments he tested several types of penicillin in various forms of his gelled oil vehicle. Aluminum penicillin, which is very insoluble in water as compared to other penicillins, was tried out in the summer of 1947 but it provided only about the same blood level prolongation as the highly soluble sodium and calcium penicillins.

26. Toward the end of 1947, when procaine penicillin was announced, Buckwalter experimented with this in his gelled oil vehicle, although it was more soluble than aluminum penicillin, and later found quite remarkable increase in blood level duration, from about 24 hours with sodium, calcium or aluminum penicillin to about 48 hours with procaine penicillin.

27. The evidence available to Buckwalter in the fall of 1947 and early in 1948 was that large particles of penicillin gave longer blood levels than small particles in POB, at least in liquid POB, for which the Food and Drug Administration had prescribed that at least half of the penicillin have a minimum particle size of 50 microns, and that according to the general rule of solutions large particles with their smaller surface area per unit weight take longer to go into solution than do small particles. It was in the face of this evidence that Buckwalter, pursuing a contrary concept, discovered that by using in his gelled oil vehicle procaine penicillin of a particle size less than 50 microns, he obtained a further increase in animal blood level duration, up to 72 hours in most cases when procaine particles below about 40 microns were used, and at least 96 hours in 80 per cent of the cases when using "micronized" procaine (having the vast majority of particles under 5 microns). Clinical tests confirmed these findings.

28. The preferred embodiment of Buckwalter's injectable comprises 300,000 units of micronized procaine penicillin per cubic centimeter of a vegetable oil gelled with 2 per cent aluminum monostearate. In the great majority of patients, this product provides therapeutically effective concentrations of penicillin in the blood for about 96 hours (4 days) following a one cc. injection. The preparation is less viscous than even liquid POB and is more easily drawn into a syringe and expelled from it, without heating. A small gauge needle may be used for both withdrawal and injection since the small penicillin particles present no problems of blocking the needle. Also, there is less tendency for the penicillin to settle out than in earlier preparations because the gel affords a very stable suspension, and the product thus requires little shaking to insure complete and uniform distribution of the particles throughout the vehicle. The preparation causes markedly fewer objectionable side reactions, such as hypersensitivity reactions, generalized allergy reactions, muscular irritation, necrosis and hemorrhage, than did POB.

29. Buckwalter's invention provided the first truly adequate solution to the pre-existing problems of a satisfactory long-lasting penicillin injectable. It provided advantages long sought, filled a definite need in the treatment of disease, and marked a great step forward in the field of medicine. It has been called by defendant "the perfect repository penicillin injectable".

30. The fact that during the period preceding the marketing of Buckwalter's product the substantial efforts

of many other independent workers skilled in the art failed to result in the discovery by them of a gelled oil penicillin injectable, and of the use of small particle procaine in that injectable, is evidence of the unobviousness of the Buckwalter preparation and of the consequent inventive character of that preparation.

31. In evidence are some thirty-one prior art publications and patents, as follows:

A Treatise on Pharmacy, Parrish (4th Ed. 1874), D. Ex. BB

A Manual of Pharmacology, Sollmann (3d Ed. 1926), D. Ex. CC

The Pharmacological Basis of Therapeutics, Goodman & Gilman (1941), D. Ex. DD

These pharmacological textbooks discuss therapeutic uses of vegetable oils, animal fats, hydrocarbons and waxes as ointments. The use of vegetable oils for injection is mentioned, but there is no mention of gelled oils for any purpose.

Unguentum Aluminii Stearatis, Fischer and Lowell, Ohio State Medical Journal 38:756 (1942), D. Ex. EE-1

This article describes ointments composed of mineral oil, fat or paraffin, mixed and gelled with aluminum stearates, the aluminum salts furnishing the therapeutic effect. There is no suggestion of injection.

Austrian Patent 90,278 to Stein and Wiechowski for "Process for the Preparation of Aluminum Salts of Fatty Acids for Therapeutic Purposes" (1922), D. Ex. EE-2

This patent covers a process for the preparation of aluminum salts and fatty acids for therapeutic purposes, particularly ointments. There is no suggestion of injection.

United States Patent 2,364,151 to McCarthy and Ambrose for "Lubricants" (1944), D. Ex. EE-3

This patent describes lubricants formed by gelling mineral oils and having some similarity to petrolatum. Brief mention is made of the use of the gelled oil for ointment purposes. Neither vegetable nor animal oils are mentioned, and there is no mention of injectable preparations.

The Preparation of Aluminum Oleate, Stich, Pharmazeutische Zentralhalle 63:261 (1922), D. Ex. EE-4

Aluminum Oleate, Wiechowski, Munchener Medizinische Wochenschrift 68:34 (1921), D. Ex. EE-5

These two articles discuss topical uses for aluminum oleate in preference to lead oleate.

DDT Penetration Prevented by Adding Aluminum Stearate to DDT-Kerosene Solutions, Ebeling, Journal of Economic Entomology 38:689 (1945), D. Ex. EE-6

A report of aluminum stearate mixed with DDT-kerosene solutions to maintain insecticide on the surface of the plant being sprayed.

A Method of Prolonging the Action of Penicillin, Romansky and Rittman, Science 100:196 (1944), D. Ex. EE-7

This article was the first announcement of Romansky's POB preparation employing oil-wax vehicles for the injection of penicillin.

Effect of Sulphonamide Preparations on Experimental Infected Wounds, Hawking, The Lancet (London) 243:507 (1942), D. Ex. EE-8A

Methods for the Local Application of Sulphanilamide, Hawking, British Medical Journal, p. 685 (November 15, 1941), D. Ex. EE-8B

The Rate of Absorption of Sulphonamides *In Vitro* and *In Vivo* after Local Application, Fuller, Hawking & Partridge, Quarterly Journal of Pharmacy and Pharmacology (London) 15:127 (1942) D. Ex. EE-9A

The Effect of Various Media on the Rate of Absorption of Sulphanilamide, Fuller, Hawking & Partridge, Quarterly Journal of Pharmacy and Pharmacology (London) 15:136 (1942). D. Ex. EE-9B

A Clinical and Laboratory Evaluation of the Action of Sulfonamide Ointments, Cochran, Surgery, Gynecology & Obstetrics 79:326 (1944), D. Ex. EE-10

An Evaluation of Sulfonamide Ointment Bases, Howard, New England Journal of Medicine 232:698 (1945), D. Ex. EE-12A

The Absorption of Sulfathiazole from Wounds, Waud, Canadian Medical Association Journal 51:229 (1944), D. Ex. EE-12B

These articles describe ointments containing various sulfa drugs. They describe water and oil emulsions, oil-wax paste, liquid paraffin, petroleum jelly, polyvinyl alcohol, hydrous wool fat, methyl cellulose and saline solutions as vehicles for the topical application of the sulfa drugs. One or more of them contains some discussion of studies on the rate of release of the sulfa drugs from different ointment bases. The articles make no mention of gelled oil bases, or of any injectable preparations, or of penicillin.

Oral Administration of Penicillin in Corn Oil and Lanolin, Perlstein, Kluener and Liebmann, Science 102:66 (1945), D. Ex. EE-11

A lanolin and corn oil mixture is described as a vehicle for the oral administration of penicillin.

United States Patent 2,055,083 to Klein and Grosse for "Pharmaceutical Preparation" (1936), D. Ex. EE-14

Repository Injection of Penicillin in Water-in-Oil Emulsion, Cohn et al., Proc. Soc. Experimental Biology & Medicine 59:145 (1945), D. Ex. EE-13

Theoretical & Experimental Bases of the "Durant" Preparations, Grosse, Pharmazeutische Industrie 1:3 (1942), D. Ex. EE-15

Durant Preparations, Heinz, Chemiker Zeitung No. 11/12, p. 114 (1942), D. Ex. EE-16

The Klein and Grosse patent and these technical articles all describe water and oil emulsions to be used as injectable vehicles for various medicaments. They make no mention of gelled oils. The Cohn et al. article shows that penicillin was found to lose its potency rapidly when put into an aqueous emulsion. The patent refers to the addition of certain stabilizers to the emulsion and these are said either to increase or to retard the release of the medicament. Sodium stearate is said to accelerate the release. There is no mention of aluminum, zirconium or germanium stearates, which are described by Buckwalter as the only ones he found suitable for his purposes.

Polyvinyl Alcohol as a Medium for Local Penicillin Therapy, Perryman, The Lancet (London) 249:778 (1945), D. Ex. EE-17

This article describes polyvinyl alcohol vehicles, including water solutions of this substance gelled by adding congo red, for local application and administration to surface cavities of the human body. Parenteral injection is not mentioned.

Possibilities of Polyvinyl Alcohol, Lesser, Drug and Cosmetic Industry 56:-442 (1945), D. Ex. EE-18

Polyvinyl alcohol is here described as a blood plasma substitute, a protective wound coating, a nose spray, a catgut substitute for surgical sutures, and an emulsifying agent for cosmetics. The article mentions that polyvinyl alcohol is suitable for oral and topical administration, but is not suitable for parenteral administration.

United States Patent 2,487,336 to Hinds, for "Penicillin Product" (1949), D. Ex. EE-19

The coating of penicillin particles with liquid jojoba wax is here disclosed, and all routes of administration, oral, topical and parenteral, are suggested for the coated penicillin. It is also indicated that jojoba wax may be used in the carriers employed for the topical and parenteral preparations, but the full compositions of these carriers are not indicated.

Metallic Soaps, Mallinckrodt Chemical Works (1946), D. Ex. EE–20

This describes a variety of uses of oils gelled by a variety of stearates, with emphasis on the lubrication, paint and waterproofing fields and mention of such other uses as cosmetics and ointments. Substantial information is given as to the technique of gelling oils by the various stearates, with emphasis on the production of strong gels. No mention is made of any use of the stearates in injectable preparations.

Metallic Stearates, Monsaroff, Canadian Chemistry and Process Industries 26:193 (1942), D. Ex. EE–21

This article repeats some of the information appearing in D. Ex. EE–20. It bears an earlier date but is less complete.

United States Patent 2,519,112 to Coghill et al. for "Penicillin Salts of Aminoacid Esters of Sterols and Preparation Thereof" (1950), D. Ex. EE–22

This discloses a very complex amino salt of penicillin which is described as less soluble than the forms of penicillin known at the time the patent was applied for (February 20, 1947). It is substantially different from the relatively simple procaine salt, though the latter is an amine. Uses of the new penicillin in plain oil and in the oil-wax vehicle of Romansky are suggested. There is no suggestion of a gelled oil vehicle.

Colloid Chemistry Theoretical and Applied, Alexander (1928), D. Ex. FF–1

Colloidal Phenomena, Hauser (1939), D. Ex. FF–2

Physical Methods of Organic Chemistry, Weissberger (1945), D. Ex. FF–3

These are general textbooks on the indicated subjects. They have no disclosure of injectable preparations.

Hauser discloses the general law of solubility that a substance goes into solution more rapidly when it is in small particle form than when in large particle form.

32. Buckwalter was engaged during parts of 1943 and 1944 in certain confidential ointment work conducted on behalf of several governmental war ointment committees. He produced many ointment bases for examination and study by other members of those committees, these bases being of the emulsion type, carbowax type, and grease type. Numerous different compositions were involved in these several types. Of the grease type alone he prepared some 109 different compositions for ointment bases. Ten of these involved peanut oil, gelled with from 6 to 30 per cent of various aluminum stearates; the remainder involved gelled mineral oils or petrolatum.

33. In April 1943, during this war committee work, Buckwalter received from Dr. Lazier, of DuPont, several tubes of an ointment having as a base peanut oil gelled with aluminum stearate. This ointment carried a liquid medicament and was intended for application to the eyes to combat Lewisite gas. It contained no penicillin. There is no evidence as to the percentage of aluminum stearate used.

34. There is no evidence that penicillin was ever added to any of the ointment bases studied by the war ointment committees. And even if it were to be assumed that it was added to one or more of the bases, there is nothing to identify the particular character of those bases or to indicate that adequate tests were made to establish their suitability for any purpose.

35. None of the developmental ointment bases with which Buckwalter and others worked for the war committees were adopted by the military authorities; they decided to continue to use petrolatum (a mineral oil fraction) for their ointment bases. Also this war-time ointment research was kept secret and there is no evidence that it was made public at any time prior to 1948.

36. Beginning about June, 1944 after completion of his work for the war oint-

ment committees, Buckwalter made a gelled peanut oil ointment base for plaintiff and a very small amount of penicillin was added to it (about one six hundredth as much as in standard injectables). Defendant has conceded that even ten times the amount of penicillin in this ointment would not produce a measurable penicillin blood level on injection. This was private research work, and has not been made public.

37. There is no disclosure in the prior art of any preparation comprising a gelled injectable oil containing penicillin as the medicament.

38. There is no disclosure in the prior art of any penicillin ointment containing a concentration of penicillin sufficient to create a therapeutically effective blood level systemically upon injection.

39. The product claims in suit define new compositions of matter which differ from any compositions previously disclosed, known, suggested, taught, sold or used.

40. The process claims in suit define new combinations involving the use of specific substances in specific steps under particular conditions to produce the new compositions of the product claims.

41. The characteristics, requirements and behavior of ointments are considerably different from those of injectable preparations. For example, most ointment bases contain as part of the base certain ingredients, such as mineral oil, generally regarded as unsuitable for injection purposes. Many ointments contain medicaments which are harmful if injected. Ointments are not required to be sterile, but this is a prerequisite for injectables. Different body mechanisms are involved in obtaining the local effect from the medicaments in ointments and the systemic effect from the medicaments in injectables. The body reactions to the two types of preparation are also quite different. Injectables present problems of toxicity to the bodily organs, such as the kidneys, which are not presented by ointments. The entire composition of an injectable must be disposed of by the body, whereas ointment bases are merely scraped or washed away from the site of application.

42. There was no disclosure, teaching or suggestion prior to Buckwalter's work that a gelled oil would be suitable as a vehicle for the injection of penicillin or of any other drug, and that no serious disadvantageous effects on the body would be caused by the gelling agent or the gelled mass of oil.

43. There was no disclosure, teaching or suggestion prior to Buckwalter's work that a gelled oil would be suitable as a vehicle for the injection of penicillin or of any other drug, from the standpoint of providing a preparation which lends itself to easy administration of the drug, as by keeping the penicillin in suspension while standing for long periods of time and yet being sufficiently fluid for easy syringeability.

44. There was no disclosure, teaching or suggestion prior to Buckwalter's work that a gelled oil would be suitable as a vehicle for the injection of penicillin or of any other drug, from the standpoint of providing prolonged therapeutic blood levels upon injection.

45. There was no disclosure, teaching or suggestion prior to Buckwalter's work that small particle procaine penicillin would, in any vehicle, provide blood level prolongation substantially greater than that provided by large particles in the same vehicle, and there was prior and contemporaneous evidence to the contrary. Buckwalter's finding in this respect was unpredictable from any prior knowledge or teaching, and defendant has admitted that it reversed some previous views on the role of particle size in penicillin injectables.

46. At the time of Buckwalter's invention there were various theories as to why the elements of his product reacted in combination to achieve the results they produced, but these theories have been largely refuted and there is no truly satisfactory explanation available today. That increased viscosity is not the answer is shown, for example, by the fact

that liquid POB was just as effective as the old solid POB. Water repellency of aluminum monostearate and insolubility of procaine penicillin are at most partial answers, which are in part controverted by other evidence, such as the ineffectiveness of other salts of penicillin, e. g., aluminum penicillin, which are less soluble than procaine penicillin.

47. Prior to Buckwalter's invention, there was nothing in the art relating to injectables, and particularly repository penicillin injectables, to indicate generally what properties of a vehicle would bring about repository effect.

48. None of the prior patents or publications taken singly or collectively, nor any other evidence relating to teachings or knowledge prior to Buckwalter's invention, anticipates or discloses any of the combinations of the claims in suit, or suggests or teaches any of those combinations. In the absence of Buckwalter's teachings, the selection of the elements comprising his product, and the steps, conditions and materials employed in his process, were not obvious to persons of ordinary skill in the art. The Buckwalter invention and each of the claims in suit is patentably distinguishable from the prior art and required the exercise of inventive skill.

49. There was no public use or sale of any of the combinations of the claims in suit nor any disclosure of any of these combinations by patent or printed publication, prior to Buckwalter's invention or prior to the effective application date for the patent in suit.

50. The preferred form of Buckwalter's invention was first marketed by plaintiff in May 1948.

51. Doctors accorded a prompt and warm reception to the Buckwalter invention because of its numerous points of superiority over POB and other predecessor techniques and preparations for prolonging blood levels. Most of them quickly stopped buying POB and began buying the Buckwalter product. The resulting decline in the demand for POB and the competitive pressure to make and sell the new type of product caused all penicillin manufacturers in the United States to go over to the production of the Buckwalter product and to discontinue production of POB. Shortly after the appearance of the Buckwalter product, quantities of previously marketed POB were returned and this latter product dropped from the market. It is not being sold today in any form. The advent of the Buckwalter invention was a severe blow to POP, which never reached the market.

52. The demise of POB was not alone caused by the advent of the Buckwalter invention. Procaine penicillin in oil and water suspensions providing blood levels comparable to those of POB without certain of its disadvantages, also attracted doctors who had used POB. For therapy where maximum prolongation of blood levels after a single injection was not a prerequisite, as for mild infections or where the doctor was certain of seeing the patient at frequent intervals, procaine in oil alone or in water was adequate and some doctors, especially in hospitals, have used it in lieu of the preferred form of the Buckwalter invention. Even in these applications, however, other doctors have preferred the Buckwalter invention because of the disadvantages experienced with procaine in oil alone or in water due to settling of particles and plugging of needles. And in the treatment of venereal diseases and trepenomal diseases related to syphilis, POB gave way, not to procaine in oil or water, but virtually completely to the Buckwalter invention.

53. Eleven out of the fourteen major manufacturers of penicillin products in the United States including Abbot, Lilly, Merck, Pfizer, Sharp & Dohme, Squibb, Upjohn and Wyeth have taken licenses under Buckwalter patent 2,507,193 and, in some instances, also under the applications on which that patent later issued. The average license royalty has amounted to only about one-fifth cent for each 300,000 unit injection of the product.

54. Neither plaintiff's practices in offering licenses to these manufacturers,

nor the terms of the licenses themselves, singly or jointly, constitute any misuse of Buckwalter patent 2,507,193.

55. From the time of its introduction in the spring of 1948 up to the trial of this action in July 1952, over 100,000 billion units of the preferred form of the Buckwalter invention (enough for one-third billion 1 cc. injections) have been sold in the United States alone. The total dollar value of these sales has exceeded $50,000,000.

56. Clinical investigations of the treatment of syphilis with the preferred form of Buckwalter's invention revealed that therapeutically effective levels of penicillin could be maintained in the blood for from 6 to 8 days in a high percentage of patients who received a single 4 cc. injection of the preparation (containing 1,200,000 units) and for a slightly longer period in patients who received 8 cc.'s in a single injection or two simultaneous 4 cc. injections.

57. In the fight against syphilis in this country, the preferred form of Buckwalter's invention has been named the product of choice by the United States Public Health Service and, since the advent of this product, treatment centers and boards of health all over the nation have been using and recommending it. The product is virtually the sole product used today for the treatment of syphilis. A great deal of the remarkable decrease in the past several years in the prevalence of syphilis, throughout the eastern and northern United States especially, is credited to the Buckwalter invention.

58. Using single shot injections of 1,200,000 units (4 cc.) of the Buckwalter product exclusively, mass eradication programs have begun against pinta in Mexico and, under the United Nations, against yaws in Haiti (over 500,000 natives having been already treated there), against bejel in Israel, and against these and similar diseases in Indonesia, Yugoslavia, Iran and Iraq. Pilot experiments using this product against such diseases have also been started in Egypt, Venezuela and the Philippines.

59. No POB using procaine penicillin has ever been sold. What evidence there is in the record regarding experimental work with this preparation shows that its blood level prolongation is inferior to that provided by the preferred form of the Buckwalter invention. Also since dosages of POB administered in one injection are limited by the adverse reactions caused by the wax it contains, the commercially non-existent POB with procaine penicillin is undesirable for single shot mass eradication programs and has not been so used.

60. The tremendous commercial and medical success achieved by the Buckwalter invention constitutes, against the background of prior intensive and at best only partially successful efforts to solve the problem of penicillin blood level prolongation, corroborative evidence of the merit and inventiveness of Buckwalter's work.

61. Application for Buckwalter patent 2,507,193 was filed on May 17, 1949, Serial No. 93,640, as a continuation-in-part of two prior co-pending applications of Buckwalter: Serial No. 819, filed January 6, 1948, and Serial No. 19,497, filed April 7, 1948.

62. As filed, these applications were in regular form and were filed with no intent on the part of Buckwalter, plaintiff or plaintiff's attorneys to deceive, by acts or statements of commission or omission, the Patent Office or the public with respect to the facts related therein, and there is no evidence that the Patent Office or the public has been deceived or misled as to any such fact.

63. During the prosecution of these applications no acts, statements or remarks of omission or commission were made by Buckwalter, plaintiff or plaintiff's attorneys with the intent to deceive the Patent Office or the public, and there is no evidence that the Patent Office or the public has been deceived or misled as to any material fact.

64. During the prosecution of these applications no acts, statements, admissions or remarks were made by Buckwalter, plaintiff or plaintiff's attorneys.

which constitute an abandonment of the invention as set forth in the claims in suit, or any portion thereof, or which create any estoppel on plaintiff in this respect.

65. Some of the prior art patents and publications introduced in this action by defendant were cited by the Patent Office during the prosecution of these applications. There is no evidence to show whether or not other patents and publications here introduced by defendant were also considered by the Patent Office, but not cited by it, during its examination of these applications.

66. Two interferences were declared by the Patent Office between Buckwalter application Serial No. 819 and three other applications whose disclosures related to the concept of using a gelled oil for penicillin injectables, but did not relate to the concept of using small particle procaine penicillin in that gelled oil. Both interferences were settled in favor of Buckwalter, following an exchange of evidence among the parties, and defendant has stipulated, after examination of this and other evidence, that Buckwalter was entitled to the priority that was conceded to him.

67. No evidence appears in this record that the work of these other applicants was done independently of any disclosure by Buckwalter. On the contrary, the evidence admits of the possibility that these other applicants may have derived indirectly of Buckwalter the idea of using a gelled oil as a penicillin injectable vehicle.

68. The disclosure of Buckwalter patent 2,507,193 properly describes the invention and is adequate to teach the invention to those skilled in the art.

69. The term "similar preparation" used in each of the product claims of Buckwalter patent 2,507,193 refers to a product having a plain oil vehicle, and not to POB whose vehicle comprises oil and wax.

70. The term "dispersed" used in each of the product claims of Buckwalter patent 2,507,193 to relate the stearate or its equivalent to the oil requires that the oil be gelled by the stearate or its equivalent.

71. The particle size designation used in product claims 9 and 14 and process claim 17 of Buckwalter patent 2,507,193 conforms with the practice of those skilled in the penicillin art, including defendant's own practice, and is clear, definite and unambiguous.

72. Each of the claims in suit, on its face, and when read in light of the patent specification, is clear, definite and unambiguous. There is no evidence that those skilled in the art, or the public generally, would consider the claims otherwise.

73. Each of the claims in suit, on its face and when read in light of the patent specification, particularly points out, distinctly claims and accurately defines and delimits the invention, and does not overclaim the invention, such as by going beyond the disclosure, by covering inoperative preparations or processes, or otherwise. There is no evidence that those skilled in the art, or the public generally, would interpret the claims otherwise.

74. Prior to the time it learned of Buckwalter's invention, defendant had never considered making a penicillin injectable preparation of that type, although it had devoted efforts to developing an injectable superior to POB and had done substantial research work with POP. When the demand from the field indicated that there was a distinct trend toward the use of preparations of the Buckwalter type, defendant, in June 1948, deliberately set out to "duplicate" plaintiff's commercial product embodying the preferred form of the invention. After some production difficulties, defendant put its duplicate on the market in November 1948, the same month in which it substantially discontinued sales of POB, and has made and sold this duplicate widely since that time.

75. Defendant's accused product comprises 300,000 units of micronized procaine penicillin per cc. of sesame oil gelled with 2 per cent of aluminum monostearate, and is identical in composition

and characteristics with plaintiff's product which it copied, except for the use of sesame oil instead of peanut oil. These latter oils are equivalent injectable oils and the change was made by defendant to a "sesame oil duplicate" of plaintiff's product because it believed that the use of sesame oil was preferred by some doctors. Plaintiff also makes and sells a sesame oil Buckwalter product.

76. That defendant followed the teachings of Buckwalter and not the disclosures of the prior art is additional evidence of the utility and unobviousness of Buckwalter's discovery.

77. Defendant's accused product embodies the invention of, and infringes, each of claims 1–5 and 8–11 of the patent both in terms and in substance; all particulars referred to in these claims are fully met by that product.

78. Defendant's accused product embodies the invention of, and infringes, each of claims 7, 13 and 14 of the patent, because the sesame oil used in defendant's product is an equivalent, for purposes of the invention, of the peanut oil specified in those claims, and because all other particulars referred to in these claims are fully met by that product.

79. Defendant's accused process embodies the invention of, and infringes, each of claims 15–17 of the patent, because in every particular referred to in these claims the process steps and the materials employed in that process are the same as or the substantial equivalents of those set forth and claimed in the patent.

80. By stipulation of the parties it was agreed that in the event of a decision for the plaintiff on the issues of validity, infringement and enforceability of any of the claims of the Buckwalter patent in suit, the Court would reserve until an accounting, if one should be ordered, its decision upon the issues of whether the infringement by defendant was intentional, willful and deliberate; also its decision as to any award of reasonable attorney fees.

81. There is no evidence in this record which would absolve defendant of its infringement, as by express or implied license from plaintiff, unclean hands on the part of plaintiff, misuse of the Buckwalter patent, or otherwise.

Conclusions of Law

From the foregoing facts the Court concludes:

1. That this Court has jurisdiction over the parties and the subject matter in the cause of action.

2. Buckwalter patent 2,507,193 was duly and legally issued by the United States Patent Office on May 9, 1950. No misrepresentations warranting invalidation of this patent were made by Buckwalter or plaintiff during the prosecution in the Patent Office of the applications on which this patent is based.

3. Each of claims 1–5, 7–11, 13 and 14, relating to the patented product, and claims 15–17, relating to the patented process for making that product, of Buckwalter patent 2,507,193 sets forth subject matter which is not anticipated, disclosed, taught or suggested by all or any part of the prior art; and each required the exercise of inventive skill, defines patentable invention, and is good and valid in law.

4. Each of claims 1–5, 7–11, 13 and 14, relating to the patented product, and claims 15–17, relating to the patented process for making that product, of Buckwalter patent 2,507,193 is supported by a disclosure adequate to teach the invention; each particularly points out and distinctly claims the invention, without overclaiming; each is clear, definite and unambiguous; and each otherwise complies in full with the formal requirements of the patent statutes, and is good and valid in law.

5. Defendant has infringed each of claims 1–5, 7–11, 13 and 14 of Buckwalter patent 2,507,193, by its manufacture, use and sale of its accused products.

6. Defendant has infringed each of claims 15–17 of Buckwalter patent 2,-

507,193 by its use of its accused processes.

7. Plaintiff has not been guilty of any misuse of its patent because of its activities in licensing Buckwalter patent 2,507,193 and the applications on which this patent is based, or otherwise; nor does it come into this Court with unclean hands or with any inequity arising from its conduct in prosecuting these applications in the Patent Office, or otherwise. Buckwalter patent 2,507,193 is enforceable.

8. Plaintiff is entitled to a judgment providing for a permanent injunction against further infringement of Buckwalter patent 2,507,193 by defendant, its agents, those under its control and those in privity with it; and plaintiff is entitled to recover damages suffered by it by virtue of the infringement by defendant of Buckwalter patent 2,-507,193, such damages to be in an amount adequate to compensate plaintiff for the infringement, and in no event less than a reasonable royalty for the use made of the invention by the defendant; and in the event it is hereafter found by the Court that defendant's infringement has been intentional, willful and deliberate, plaintiff shall be entitled to treble the amount of its damages, the question of such intentional, willful and deliberate infringement being reserved for further consideration by the Court in connection with an accounting to be had in this matter. Plaintiff is entitled to recover its costs and disbursements in this action, together with interest and reasonable attorney fees, the amount of which is to be fixed after an accounting herein.

9. This case is referred to a special master to be hereafter designated by this Court who shall proceed to make and state an account of such damages, costs and interest, and to report thereon with all convenient speed. The defendant, its officers, employees and agents are hereby directed and required to attend before the special master as he may direct and to produce before him such information and documents as relate to the matter in issue and to submit to such oral examination as the master may require.

Let judgment be entered accordingly.