SOLEX LABORATORIES, Inc., Plaintiff,

v.

Robert GRAHAM; John L. Roberts d.b.a. John L. Roberts Optical Co.; M. Charles May; George W. Spratt Optical Company, Doctors Contact Lens Service, Inc., and Sterling P. Dunham; Dr. Barry Bleeck; and M. Lon Kasow, Defendants.

SOLEX LABORATORIES, Inc., Plaintiff,

v.

John L. ROBERTS, d.b.a. John L. Roberts Optical Co., Defendant.

SOLEX LABORATORIES, Inc., Plaintiff,

v.

M. Charles MAY, Defendant.

SOLEX LABORATORIES, Inc., Plaintiff,

v.

GEORGE W. SPRATT OPTICAL COMPANY, Doctors Contact Lens Service, Inc., and Sterling P. Dunham, Defendants.

SOLEX LABORATORIES, Inc., Plaintiff,

v.

Dr. Barry BLEECK, Defendant.

SOLEX LABORATORIES, Inc., Plaintiff,

v.

M. Lon KASOW, Defendant.

Civ. Nos. 19497, 19498, 19558, 19679, 19986, 20484.

United States District Court
S. D. California,
Central Division.

Aug. 6, 1958.

Hazard & Miller, by Allan D. Mocka-bee, Los Angeles, Cal., for plaintiff.

Bair, Freeman & Molinare, Chicago, Ill., by Will Freeman, A. W. Molinare, W. M. Van Sciver, Chicago, Ill., and William Douglas Sellers, Pasadena, Cal., for defendants Robert Graham; John L. Roberts, d.b.a. John L. Roberts Optical Co.; and M. Charles May.

Mason & Graham, by Collins Mason, Los Angeles, Cal., and Martineau & Martineau, by L. R. Martineau, and Glenn B. Martineau, Los Angeles, Cal., for defendants George W. Spratt Optical Co., Doctors Contact Lens Service, Inc., and Sterling P. Dunham.

Mason & Graham by Collins Mason, Los Angeles, Cal., for defendant Dr. Barry Bleeck.

Lyon & Lyon, by Reginald E. Caughey, Los Angeles, Cal., for defendant M. Lon Kasow.

TOLIN, District Judge.

This patent infringement litigation concerns but one patent. There are several separately filed cases which have been consolidated for trial. There are different accused structures in the various cases. The patent is not a stranger to this District Court. In the unreported case of Solex Laboratories v. Pacific Contact Laboratories, another Judge of this Court held it valid. The decision was affirmed on appeal.[1] Attorneys for the defendants in the present case have insisted that the former case was but little more than a default. From the entire record on appeal that does not appear to be a correct appraisal of the prior litigation. Although the attorneys in that case are also among the attorneys in the present consolidated cases, the named party defendants are different and the doctrine *res judicata* accordingly does not apply. The patent in suit was issued to Kevin M. Tuohy and bears Number 2,510,438. It was assigned to plaintiff. The claims read:

"I claim:

"1. A contact lens applicable to the human eye comprising a concavo-convex lens formed of light-transmitting material having a marginal size smaller than the limbus portion of the eye to which it is applicable but larger than the maximum iris opening, said lens having a radius of curvature on its concave side slightly greater than the radius of curvature of the cornea to which it is applied so that radially from the center of the lens there will be a small but gradually increasing clearance for the entry of natural eye fluids between the lens and the cornea, said lens being ground to correct for visual deficiency.

1. Pacific Contact Laboratories, Inc., v. Solex Laboratories, 9 Cir., 1953, 209 F.2d 529.

"2. A contact lens applicable to the human eye comprising a concavo-convex lens formed of light-transmitting material having a marginal size smaller than the limbus portion of the eye to which it is applicable but larger than the maximum iris opening, said lens having a radius of curvature on its concave side slightly greater than the radius of curvature of the cornea to which it is applied so that radially from the center of the lens there will be a small but gradually increasing clearance for the entry of natural eye fluids between the lens and the cornea, said lens being ground to correct for visual deficiency and having a bevel at its marginal edges on the concave side thereof."

■ The patent is presumptively valid.

"* * * The issue of the patent is enough to show, until the contrary appears, that all the conditions under which a discovery is patentable in accordance with the statutes have been met. Hence, the burden of proving want of novelty is upon him who avers it."[2]

"* * * Not only is the burden to make good this defense upon the party setting it up, but his burden is a heavy one, as it has been held that 'every reasonable doubt should be resolved against him.' * * * ".[3]

■ Whatever may be said for the prior art hereafter discussed, it appears that before the introduction of the Tuohy lens, contact lenses for the correction of vision in the human eye were cumbersome and uncomfortable structures to which the user had only a tolerance of brief duration at a given use. There was an interference with normal vision. This was manifested by the appearance of rainbows or halos within the user's field of vision and clouding of the vision after the lenses had been worn for a short time. These earlier lenses were what have generally been referred to in the optometrical field as scleral lenses. By this was meant that although the portion of the lens employed to correct vision was small, the lens extended beyond the border of the vision correcting area so as to be a glass or plastic structure which extended beyond the cornea with the edges resting on the scleral portion of the eye. The scleral lenses had flanges. The presence of these scleral flanges made such contact lenses very difficult to wear. When in use they pressed on the sclera and covered the sclera to a large extent and tended to restrict the natural blood supply to the eye. They also interfered with the free movement of natural eye fluids, and the eye covered by such a lens was deprived of free circulation of natural eye fluids and the supply of oxygen normally available from the air. A buffer solution compatible with the tissues of the patient was necessarily used. The halos and cloudiness which interfered with the patient's vision, as above stated, arose from the circumstance that the buffer solution deteriorated rapidly during use. Despite the considerable practical limitation of undertaking to use a scleral lens instead of conventional spectacles, there was some small demand for these lenses because they did enable the user to correct his vision without being patently aided by eye glasses, and the very nearness to the eye was believed in some instances to be beneficial in ameliorating certain pathological conditions. Apparently the custom was for persons willing to undergo the discomfort and inconvenience of a short period of tolerance of the lenses to use them for maximum periods of a very few consecutive hours. In the light of this cumbersome and often painful application and functioning of the pre-Tuohy lenses, Tuohy is corroborated in his insistence that his work was the originally successful corneal lens by the fact that following the in-

2. Walker on Patents, § 116.

3. Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983.

vention disclosed by the patent, a sizeable industry in the manufacture of corneal lenses promptly came into being and those who prescribed glasses for the correction of visual deficiencies commenced to prescribe them with frequency. Use of the scleral lenses declined. The public acceptance was considerable and the corneal lenses enjoyed immediate commercial success whereas the scleral lenses had achieved only occasional tolerance by some unfortunate user whose occupation [4] or pathology drove him to a toleration of the inconvenience, discomfort and visual deficiencies. Had any of the predecessors cited as prior art been able to accomplish the generally satisfactory result of the Tuohy lens, such a structure would, in great probability (in the light of the willingness of the public to accept a contact lens) have been readily accepted. However, the prior art cited against the invention is, for the most part, patently beside the point. Some foreign language publications have been received in evidence. These so meagerly described the structures with which they dealt, or adequately described some widely different device, that those interested in contact lenses for correction of visual deficiencies were not thereby led to create the Tuohy type lens.

■ That the Tuohy lens rapidly very largely replaced the scleral lenses in the market, is some evidence of successful novelty.[5] The inventor developed an entirely different approach to a solution of the hitherto unsolved problems. He eliminated the scleral flange entirely and manufactured a contact lens which would cover only the cornea. It correctly appeared to him that if the buffer solution between the lens and the surface of the eye could be natural eye fluid rather than a prescriber's compounded solution, the clouding, halos, and other unhappy visual manifestations would be eliminated. To accomplish this, Tuohy designed his lens to have a radius of curvature slightly greater than the radius of curvature of the patient's cornea. As set forth in the patent, this is made evident by the following:

> " * * * if the radius of curvature of the cornea measures 7.8 millimeters the radius of curvature of the concave side of the lens need only be 7.9 or possibly 8.0 millimeters."[6]

The result was that by having a gradually increasing space between the apical portion of the cornea and the lens, the natural tear fluids would be able to circulate beneath the lens, and instead of experiencing rapid deterioration of the buffer solution, the user would enjoy a continuous reception into the area of natural eye fluids. The remarkable part of this new lens is that although it is larger or flatter than the cornea, it remains attached to the eye by capillary action and it does not slide to the bottom of the eye and remain there. Also, though there may be temporary displacements from the cornea, simple blinking of the eyelids causes the Tuohy lens to re-center itself with respect to the cornea whenever such a temporary displacement occurs. To facilitate the passage of the edge of the lens over the protruding limbus when the lens is temporarily displaced over the cornea, a bevel is provided. The beveling also facilitates the entry of the tears behind the lens. The fact that the inside, or concave, surface actually is slightly flatter, or may be regarded as having a slightly greater radius of curvature at the cornea, causes the lens to immediately engage the surface of the eye only at the apical portion

---

4. Athletes, actors, actresses, etc.

5. "Commercial success should be taken into consideration by the trial court, and by this court, but it does not, without more, determine invention. 'Commercial success without invention will not make patentability.'" Container Corporation of America v. M. C. S. Corporation, 9 Cir., 250 F.2d 707, 709.

6. The defendants complain that the "if" robs this statement of definiteness. The inventor, of course, was dealing with the circumstance that as to size of their individual parts, all men are created unequal.

of the cornea. Thus the lens will actually contact the cornea at the center while the portion of the lens over its periphery is slightly spaced therefrom. The lens is slightly smaller than the limbus portion of the eye but larger than the maximum opening of the iris. Although today the Tuohy development does not seem particularly involved and now appears to be the natural way in which to construct an efficient contact lens, it is apparent from the evidence that Tuohy's simple structure was not understood or known prior to his invention. Tuohy arrived at a simple solution to a difficult problem. In doing this he went far beyond the skills of a competent workman in the art. The concept of his structure was entirely new. To attempt to read any of the cited prior art upon the Tuohy lens is to strain and torture beyond the understanding of that prior art before Tuohy, and the Court cannot find that Tuohy's invention was taught him by that obscure and infrequently used prior art.

The Supreme Court in Cuno Engineering Corp. v. Automatic Devices Corp.[7] set forth the following test for a patentable device:

" * * * the new device, however useful it may be, must reveal the flash of creative genius not merely the skill of the calling. If it fails, it has not established its right to a private grant on the public domain."

Neither Judicial nor statutory sources disclose a short, succinct definition of invention. However, the following quotations illustrate the philosophy of the concept of "invention":

"In order to rise to the dignity of invention the conception of the patent must be the result of the exercise of the inventive or creative faculty, not of mere mechanical skill." [8]

" * * * The quality which constitutes invention is indefinable, as has often been said. McClain v. Ortmayer, 141 U.S. 419, 12 S.Ct. 76, 35 L.Ed. 800. It depends on a judicial estimate of the intellectual qualities of the group mind of those engaged in a given art, made in the light of what may be called common knowledge. It is a matter of feeling rather than of logic. There must be something not found in the mind of the skilled workman, an originating quality most frequently noticeable in works of art. Noticing a defect in existing apparatus, or the chance or need of improvement in it, is the first step in invention. * *".[9]

"[1] On the major issue of validity we shall first inquire whether the conception for which the patent was granted involves invention. Because of the lack of a definite rule, questions of this kind are often perplexing. It is a trite saying that invention defies definition. Yet, through long use, the word has acquired certain characteristics which at least give direction to its meaning. Invention is a concept; a thing evolved from the mind. It is not a revelation of something which exists and was unknown, but is the creation of something which did not exist before, possessing the elements of novelty and utility in kind and measure different from and greater than what the art might expect from its skilled workers."[10]

"An invention is the result of an inventive act; it consists in (1) a mental operation involving the conception of an idea and (2) a physical operation involving the reduction to practice of the inventive concept. An invention is the product of original thought; it is a concept, a thing evolved from the mind. It involves

7. 314 U.S. 84, 91, 62 S.Ct. 37, 41, 86 L. Ed. 58.

8. Callison v. Boyle, 10 Cir., 1938, 95 F.2d 575, 576.

9. Warren Telechron Co. v. Waltham Watch Co., 1 Cir., 1937, 91 F.2d 472, 473.

10. Pyrene Mfg. Co. v. Boyce, C.C., 292 F. 480, 481, certiorari denied, 1923, 263 U.S. 723, 44 S.Ct. 231, 68 L.Ed. 525.

the spontaneous conception of 'happy thought' of some idea not previously present to the mind of the inventor; it is the creation of something which did not exist before. Such is the mental part of the inventive act." [11]

The Appellate Court for this Circuit,[12] in its earlier decision upholding this patent, said:

" * * * on July 19, 1952, as part of the revision of Title 35 U.S.C.A. on Patents, 66 Stat. 792, Congress enacted § 103 which provides in part that,

" 'Patentability shall not be negatived by the manner in which the invention was made.' The reviser's note interprets this sentence to mean 'that patentability as to this requirement [i. e. invention] is not to be negatived by the manner in which the invention was made, that is, it is immaterial whether it resulted from long toil and experimentation or from a *flash of genius* [Italics Appellate Court's]'. That is, as we understand it, the Congress by enacting § 103 showed its fear that the meaning of the phrase 'flash of creative genius' as used by the Supreme Court in Cuno Engineering Corp., supra, would result in excluding from patentability most if not all mechanical advances derived from study and experimentation. We do not think the phrase 'flash of creative genius' implies, or was intended to imply, that patents or patentability spring from inspiration at the cost of reason. The phrase was used more for emphasis than as patent dogma, and the Supreme Court was emphasizing the principle that patentability implies more than mere mechanical skill and that a phase of discovery is necessary. The opinion in which the phrase is used did not change the law. * * * "

Some of the same counsel who represented the infringer in the Pacific Contact Laboratories, Inc., v. Solex Laboratories case appear for the defendants in this case and contend that not all the prior art was brought to the attention of the Court in that case. These counsel have dug deeper into literature and have now cited some fifteen prior art exhibits none of which disclose the individual novelty of the present invention. Some were cited in the Pacific Contact Laboratories v. Solex Laboratories, Inc., case; some were not so cited. These omissions from the briefs in the earlier case were unimportant for the newly cited art does not add anything of worth to defendants' case. Noted briefly, the Court finds in Tuohy's invention some elements common to the prior art. For instance, they are all contact lenses applicable to the human eye. With one exception, all are concave lenses formed of light transmitting material. From that point on in the comparison of characteristics, there are more points of dissimilarity than of similarity. Allen alone has a marginal size smaller than the limbus portion of the eye to which it is applied. However, Allen cannot by any reasonable interpretation be considered a glass to be used by the wearer for correction of visual deficiencies. To adapt it to such a use would be to change it beyond recognition. It came into evidence as Tab 8 of Defendants' Exhibit "B". This article is in "Science", a weekly journal devoted to the advancement of Science. The title of the article is "Scientific Apparatus And Laboratory Methods". The sub-title reads: "A New Contact Lens For Viewing The Angle Of The Anterior Chamber Of The Eye". Early in the article, the purpose and use of the lens is described:

" * * * It is possible to examine the chamber angle by use of a contact lens which eliminates internal reflection and creates a visual

11. Walker on Patents (Deller's Ed., Vol. 1, § 23, p. 110) The Law of Patents for Invention.

12. Pacific Contact Laboratories, Inc., v. Solex Laboratories, 9 Cir., 209 F.2d 529, 532, 533.

angle which passes behind the limbus."

It thereby appears that the user of the lens would be an examiner of the eye rather than a person using some form of eye glass for correction of visual deficiencies. The entire purport of the article is that this lens is an examiner's instrument rather than a reader's lens.

None of the cited prior art taught the correction of the specific evils which were specifically overcome by Tuohy.

The prior art does teach a characteristic of the structure to be larger than maximum iris opening but this does not go to the *essence of the invention*. It was also one of the characteristics of the scleral lenses which were so faulty. Not one of the cited examples of prior art teaches a radius of curvature on its concave side slightly greater than the radius of curvature of the cornea to which it is applied so that radially from the center of the lens there will be a small but gradually increasing clearance for the entry of natural eye fluids between the lens and the cornea. Despite the absence of this characteristic in each one of defendants' prior art exhibits, this characteristic is the very heart of the teaching of the patent in suit. It is what eliminates an artificial buffer solution and permits free use of natural tear fluids. This was new in the contact lens art and the discovery of how to accomplish it was invention. Not a single exhibit in the cited prior art has a bevel as either a required or optional feature.

Defendants place great emphasis upon Great Atlantic & Pacific Tea Co. v. Supermarket Corp.[13] In a concurring opinion in that case Mr. Justice Douglas wrote, in part:

"It is worth emphasis that every patent case involving validity presents a question which requires reference to a standard written into the Constitution. Article I, § 8, contains a grant to the Congress of the power to permit patents to be issued. But, unlike most of the specific powers which Congress is given, that grant is qualified. The Congress does not have free rein, for example, to decide that patents should be easily or freely given. The Congress acts under the restraint imposed by the statement of purpose in Art. I, § 8. The purpose is 'To promote the Progress of Science and useful Arts. * * *' The means for achievement of that end is the grant for a limited time to inventors of the exclusive right to their inventions.

"Every patent is the grant of a privilege of exacting tolls from the public. The Framers plainly did not want those monopolies freely granted. The invention, to justify a patent, had to serve the ends of science—to push back the frontiers of chemistry, physics, and the like; to make a distinctive contribution to scientific knowledge. That is why through the years the opinions of the Court commonly have taken 'inventive genius' as the test. It is not enough that an article is new and useful. The Constitution never sanctioned the patenting of gadgets. Patents serve a higher end— the advancement of science. An invention need not be as startling as an atomic bomb to be patentable. But is has to be of such quality and distinction that masters of the scientific field in which it falls will recognize it as an advance. Mr. Justice Bradley stated in Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438, the consequences of a looser standard:

" 'It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the

13. 340 U.S. 147, 154, 155, 71 S.Ct. 127, 131, 95 L.Ed. 162. This decision was prior to Pacific Contact Laboratories, Inc., v. Solex Laboratories. Hence, the Appellate Court for this Circuit knew the Supreme Court's views.

ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith.' " [14]

The patent in that case [15] had been granted upon:

"'4. A checker's stand * * *.

"'5. A cashier's counter for cash and carry type of grocery * * *.' "

As described in the patent itself and referred to in the opinion of the Supreme Court, the contrivance fell into the "gadget" class. As pointed out by the Supreme Court:

" * * * This counter does what a store counter always has done— is supports merchandise at a convenient height while the customer makes his purchases and the merchant his sales. * * * "

A caution was given:

"Courts should scrutinize combination patent claims with a care

proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

It is obvious from a reading of the patent then before the Supreme Court that it was entirely a different type of object than that which is now before this Court. Tuohy's invention promotes the Progress of Science in useful Arts. The sum total of the combination of old elements is a distinctively new lens which this Court finds rises to the dignity of invention. Although there is no Constitutional prohibition upon the granting of letters patent to any invention, the type of invention now before the Court is in the area which enjoys a positive Constitutional protection in its rights to a patent.[16]

Defendants have presented to this trial Court two defenses which were not presented to the trial Court in the Pacific Contact Laboratories, Inc., v. Solex

14. The question of what a "gadget" is, as that term was employed in Mr. Justice Douglas' opinion, need not be analyzed here. Clearly, the corneal type contact lens is not a mere gadget. The Progress of Science and useful Arts was served by its invention. There is uncontradicted evidence that the patented and accused lenses are particularly beneficial in treating some pathological conditions, notably Keratoconus and the post-operative conditions following removal of cataracts. In addition, the entire vision

correcting eye-glass art is useful and scientific.

15. Great Atlantic & Pacific Tea Co. v. Supermarket Corp., 340 U.S. 147, 148, 152, 153, 71 S.Ct. 127, 128, 95 L.Ed. 162.

16. U.S.C.A.Const. Art. 1, § 8, Cl. 8:
"Patents and copyrights.
"To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;"

Laboratories case.[17] These defenses were, however, urged upon and treated by the Court of Appeals in that earlier case, as follows:

"[6] Appellants raise two defenses not raised in the district court, to-wit: That there was no adequate description of the alleged invention filed in the Patent Office, and that the alleged invention is for a 'method' rather than for an 'article'. In reply, appellee urges the well known principle that objections not made before the trial court cannot be raised here on appeal. Whether we could consider either of these questions *sua sponte,* we need not and do not decide, for when laid by the side of a statement of the case they are more pointlessly technical than meritorious."

These contentions have now been fully heard before this trial Court, and after extensive exploration here this Court finds that these points merit no more credit here than to state that the foregoing succinct statement quoted from the Appellate Court fully disposes of the claim of merit in these ingenious arguments.

■ Defendant George W. Spratt Optical Company contends that the acts of infringement attributed to it were actually the acts of Doctors Contact Lens Service, Inc. which has sold corneal lenses. It is claimed that Spratt is a stranger to the infringing acts of Doctors Contact Lens Service, Inc. The Court finds that George W. Spratt Optical Company and Doctors Contact Lens Service, Inc. have a common location at 3971 Wilshire Boulevard, Los Angeles. Prior to the establishment of Doctors Contact Lens Service, Inc., the George W. Spratt Optical Company sold contact lenses. The open identification of George W. Spratt Optical Company with the contact lens market terminated at exactly the time Doctors Contact Lens Service, Inc. came into being and began selling such lenses. One-half of the corporate stock of Doctors Contact Lens Service, Inc. is held by George and Raymond Spratt, the principal stockholders of George W. Spratt Optical Company. The testimony of the Manager of Doctors Contact Lens Service, Inc. was that the new corporation was established largely as a convenience and that it was fully financed by George W. Spratt Optical Company which also controlled it. From all the evidence upon this subject, it appears without substantial contradiction that defendant George W. Spratt Optical Company set up Doctors Contact Lens Service, Inc. as a servile dummy corporation and that Doctors Contact Lens Service, Inc., although a separate corporate entity, acted under the direction of and as an agent for defendant George W. Spratt Optical Company.

It appears by substantial evidence, and the Court finds it to be true, that the contact lenses sold by defendants Robert Graham and John L. Roberts, d.b.a. John L. Roberts Optical Co., were produced by the Plastic Contact Lens Company of Chicago, Illinois. The defendant M. Charles May has vended lenses which were manufactured by the Mueller-Welt Contact Lenses, Inc. of Chicago, Illinois. The lenses from these sources embodied the principles protected by the Tuohy patent. Defendants Dr. Barry Bleeck and George W. Spratt Optical Company have sold contact lenses which completely embody the Tuohy invention. To this structure their manufacturer has added tiny facets on the rear faces of the lens. These facets are so microscopic that they cannot be detected by gross observation. Their presence can be determined by specialized viewing against a light and thereby observing a slight difference in refraction at the points where the superimposed facets add their microscopic difference to the thickness of the material.

It is the theory of these defendants that the lens sold by them under the trade name "Stimson" is held more firmly in place by reason of the facets. This contention appears to be more valuable

17. 209 F.2d 529, 533.

as a salesman's theoretical point of improvement than as an actual contribution to the functional quality of the Stimson lens. However, if there be some value, it does not follow that a patent is avoided by adding something to the patented structure.

Defendant M. Lon Kasow sells a lens known as "Vent-Air". The Vent-Air lens embodies exactly the structure of the Tuohy lens with the exception that there are very shallow depressions located at approximately the same points on the Vent-Air lens that Stimson has selected for facets on the Stimson lens. By adding a slightly greater clearance between the surface of the cornea and the microscopically removed adjacent surface of the lens, M. Lon Kasow has taken what was a sufficient clearance and added an inconsequential additional amount of clearance at inconsequential areas.

As to supposedly different structures sold by defendants Dr. Barry Bleeck, George W. Spratt Optical Company, and M. Lon Kasow, the "facets" and "grooves" are more theoretical than substantial and are of no practical consequence. It is a well-known principle of patent law that addition to a patented structure does not enable one who makes, uses, or sells the patented thing without license to avoid a charge of infringement.[18]

Plaintiff has prayed for an injunction against infringement, for an accounting for profits and damages, and for costs including reasonable attorney's fees. This much is the common demand of plaintiffs in patent infringement cases. This plaintiff asks, in addition, "trebled damages because defendant was a deliberate or willful infringer." This latter prayer is a paraphrase of part of Title 35 U.S.C.A. § 284.[19] The theory of the plaintiff is that the infringements have in each instance been intentional, wilful, and deliberate, and that the damages should therefore be trebled. The statute specifies the elements just mentioned as conditions of trebling the damages, and at least one district court has given judgment for trebled damages[20], and another district court, acting under an earlier but similar statute, has held that if the infringement is deliberate and intentional or wanton and persistent, damages will be increased by the court, but generally not unless such is the case.[21] It has been held that provision of the present statute providing for trebled damages is remedial, and damages contemplated may be awarded whether the wrong was intentional or unwitting.[22] Considering all the evidence introduced in the extended trial of this case, the Court finds that the several infringements were intentional, wilful, and deliberate, without probable cause for believing that the patent in suit was invalid. In Russell Box Co. v. Grant Paper

18. Pyrene Mfg. Co. v. Boyce, 3 Cir., 1924, 1 F.2d 185; Detroit Motor Appliance Co. v. Burke, D.C., 4 F.2d 118; Jonas v. Roberti, 9 Cir., 1925, 7 F.2d 563; McDonough v. Johnson-Wentworth Co., 8 Cir., 1928, 30 F.2d 375, 385, certiorari denied 280 U.S. 572, 50 S.Ct. 28, 74 L.Ed. 624; Mills Novelty Co. v. Monarch Tool & Mfg. Co., 6 Cir., 1935, 76 F.2d 653, 655; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 1936, 80 F.2d 912, 921.

19. "Damages.
"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.
"When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.
"The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances. July 19, 1952, c. 950, § 1, 66 Stat. 813."

20. Bristol Laboratories v. Schenley Laboratories, D.C.1953, 117 F.Supp. 67.

21. Emerson v. Simm, 1873, Fed.Cas.No. 4,443.

22. Armstrong v. Emerson Radio & Phonograph Corp., D.C.1955, 132 F.Supp. 176.

Box Co.,[23] the Court of Appeals for the First Circuit approved a district court decision which reserved the determination of whether damages should be increased beyond a reasonable royalty until after an accounting had been had. Under an earlier statute a district court stated positively that if an award of trebeled damages should be determined, it should be done after and not before an accounting.[24] Despite the finding heretofore authorized that the present infringements were in each instance intentional, wilful, and deliberate, the Court will not rule upon the question as to whether the damages shall be increased beyond allowance of a reasonable royalty until after an accounting has been had. Each of the cases is referred to Theodore C. Hocke as Special Master. Said Special Master shall determine the number of infringements which occurred between the inception of the infringing practice and the date of the filing of the complaint. The latter date must be a cut-off date under the rule of Flintkote Co. v. Lysfjord.[25]

If there has been infringement since the date of the filing of the complaints and if damages be sought for such infringement, either a new complaint will have to be filed or a supplemental complaint may be filed within this action.

As to the plaintiff's prayer for attorney's fees, the Appellate Court for the Ninth Circuit has ruled as follows:[26]

"[3] The principles which guide and control such an allowance are clear. The power is statutory; it was granted by Congress only five years ago, and it is phrased in terms of judicial discretion. 'The court may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment on any patent case'. Act of August 1, 1946, 60 Stat. 778, 35 U.S.C.A. § 70. But in granting this power, Congress made plain its intention that such fees be allowed only in extra-ordinary circumstances. The Reports of House and Senate Committees recommending this enactment provided in identical terms that 'It is not contemplated that the recovery of attorney's fees will become an ordinary thing in patent suits, * * *. The provision is also made general so as to enable the court to prevent a gross injustice to an alleged infringer.' 1946 U.S.Code Congressional Service 1386, 1387. Thus, the payment of attorney's fees for the victor is not to be regarded as a penalty for failure to win a patent infringement suit. The exercise of discretion in favor of such an allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigants normally bear. The cases support this view. Phillips Petroleum Co. v. Esso Standard Oil Co., D.C.D.Md.1950, 91 F.Supp. 215, affirmed 4 Cir., 1950, 185 F.2d 672; Associated Plastics Co. v. Gits Molding Corp., 7 Cir., 1950, 182 F.2d 1000; Union Nat. Bank of Youngstown, Ohio v. Superior Steel Corp., D.C.W.D.Pa.1949, 9 F.R.D. 117; Hall v. Keller, D.C.W.D.La.1949, 81 F.Supp. 835, modified (on other grounds) 5 Cir., 1950, 180 F.2d 753, certiorari denied 1950, 340 U.S. 818, 71 S.Ct. 48, 95 L.Ed. 601; Lincoln Electric Co. v. Linde Air Products Co., D.C.N.D.Ohio 1947, 74 F.Supp. 293, affirmed 6 Cir., 1948, 171 F.2d 223."

23. 203 F.2d 177.

24. Anchor Hocking Glass Corporation v. White Cap Co., D.C.1942; 47 F.Supp. 451.

25. 9 Cir., 1957, 246 F.2d 368.

26. Park-In-Theatres v. Perkins, 9 Cir., 1951, 190 F.2d 137, 142.

When the reports of the Special Master have been received, the Court will set the case for further hearing on the question of what part, if any, of the sought trebled damages shall be allowed and as to what its ruling shall be upon allowance of attorney's fees.

Within seven (7) days, counsel for plaintiff shall lodge orders of reference to the Special Master. The lodging of findings may await the reports of the Special Master.