The **PLASTIC CONTACT LENS COM-PANY**, a corporation, Appellant,

v.

George H. **BUTTERFIELD**, Sr., Appellee.

No. 20212.

United States Court of Appeals
Ninth Circuit.

Aug. 31, 1966.

Rehearing Denied Oct. 6, 1966.

Dugald S. McDougall, Irwin Panter, Chicago, Ill., James C. Dezendorf, Portland, Or., Carl Hoppe, San Francisco, Cal., for appellant.

R. R. Bullivant, Douglas G. Houser, Portland, Or., Collins Mason, Los Angeles, Cal., for appellee.

Before POPE, BROWNING, and ELY, Circuit Judges.

ELY, Circuit Judge:

Each of the parties owns a patent pertaining to the design and construction of corneal contact lenses. Appellant, the defendant below and hereinafter called Plastic, holds the rights to the so-called Tuohy patent, Number 2,510,438. It is senior to that called the Butterfield patent, Number 2,544,246, owned by George H. Butterfield, Sr. As plaintiff, Butterfield was successful in the court below, and Plastic appeals.

The present dispute follows a long history of controversy arising from conflicting claims pertaining to the two patents and their scope. A part of the history is interwoven with contentions in the present litigation and must be briefly reviewed.

Plastic acquired its rights to the Tuohy patent in November, 1960, when it purchased all of the capital stock of Solex Laboratories, the previous owner of the patent. Before that time, Solex had sued Plastic, alleging that the latter had infringed the Tuohy patent. In that action, Plastic challenged the validity of the patent which it now owns. See Solex Labs, Inc. v. Plastic Contact Lens Co., 268 F.2d 637 (7th Cir. 1959).

Before the transfer of its ownership to Plastic, Solex had sued Butterfield and George H. Butterfield & Son, a corporation in which Butterfield was the majority stockholder, in the United States District Court for the District of Oregon. That suit, in which Solex alleged infringement of the Tuohy patent, was pending when Plastic purchased Solex, and Plastic became a party plaintiff. Before its purchase of Solex, Plastic had, in May, 1960, purchased

from Butterfield a license under which it might employ the Butterfield patent. The Oregon suit into which Plastic had moved as plaintiff ended by compromise in April, 1962. Solex Labs, Inc. v. Butterfield, 202 F.Supp. 461 (D.Or. 1961). Pursuant to the agreement there was entered, with the consent of the parties, a judgment in which it was declared that the Butterfield patent was valid, that it had been infringed by Solex, Plastic's predecessor, and that the amount of infringement damages had been settled by agreement between Butterfield and Plastic. Under the terms of the compromise, Butterfield and the Butterfield corporation dismissed, with prejudice, all claims against Plastic (other than the settled infringement claim against Solex) and granted to Plastic a royalty-free license to the Butterfield patent. In exchange, Plastic released Butterfield, his licensees, and the Butterfield corporation from all claims of infringement of the Tuohy patent to the date of the agreement, gave to Butterfield the right to grant royalty-free licenses under the Tuohy patent to four Butterfield licensees and to the Butterfield corporation, so long as it was held by the Butterfield family, and agreed to pay Butterfield the sum of approximately $66,000. It was specifically agreed that both Plastic and Butterfield might, by solicitation, seek to enter into license agreements with existing licensees of the other and that both might enforce their rights to their respective patents against such licensees in the future.

Against the foregoing background, we now look at the present suit, filed by Butterfield in July, 1963, only fifteen months after the "settlement" of the previous litigation. In his complaint, Butterfield, seeking an injunction and damages, alleged his grievances in three causes of action. In the first, it is charged that certain acts of Plastic, committed following the settlement agreement of April, 1962, and committed "unlawfully, deliberately, and in bad faith," constitute unfair competition. In the second, it is alleged that certain acts of Plastic, speci-

fied in the first cause of action, constitute actionable interference with contractual relationships existing between Butterfield and his licensees. In the third, Plastic is accused of having breached the settlement agreement and having also, by certain of the acts specified in the first cause of action, violated antitrust laws of the United States.

Plastic filed an answer in which, generally, it denied Butterfield's accusations of wrongful acts. It also interposed a counterclaim in which it made charges against Butterfield which are somewhat similar to those made by Butterfield against it and in which it prayed for damages, as well as for injunctive relief. The jurisdiction of the District Court rested upon diverse citizenship of the parties and the requisite amount in controversy. Following trial, the court made factual determinations and arrived at legal conclusions which supported the contentions of Butterfield in all substantial respects. It issued an injunction against Plastic and, ordering that there be an accounting, adjudged that upon the determination of Butterfield's damages, the amount thereof be trebled. Plastic appeals, invoking our jurisdiction under 28 U.S.C. § 1292(a) (1).

In their briefs, the parties devote much of their discussion to the relative merits and scopes of their respective patents. The trial court also directed much of its attention to these considerations, and some of the findings and conclusions appear to be predicated upon the resolution of conflicting claims in this connection. In the posture of the case as cast by the pleadings, we see much of the evidence as being of little relevance. There is, of course, a technical difference in the arts defined in the two patents. The Tuohy patent calls for a contact lens which, on its inner surface, has a curve of greater radius than the portion of the eye which it covers. This is to provide "a small but gradually increasing clearance" between the lens and the tissue of the eye, thus allowing for lubrication which is claimed to be desirable. Certain of Butterfield's original claims, having been

rejected as "unpatentable over Tuohy," were abandoned, and the finally acquired Butterfield patent generally discloses a contact lens with two or more concentric curves on the inner surface, designed to conform to the eye's underlying curvature throughout the area covered by the lens. As we have recited, the Tuohy patent was senior. Challenges to its validity have been previously rejected, and courts, including ours, have hailed it as pioneer. Pacific Contact Labs, Inc. v. Solex Labs, Inc., 209 F.2d 529 (9th Cir. 1953). See also Solex Labs, Inc. v. Graham, 165 F. Supp. 428 (S.D.Cal.1958). The characterization bears significance, for our court wrote, long ago,

> "If pioneers, they [a patent's owners] would be entitled to a broad and liberal construction, if, mere improvers, the claims would only be entitled to a narrower interpretation."

Los Angeles Art Organ Co. v. Aeolian Co., 143 F. 880, 882 (9th Cir. 1906). Here, the District Court determined that the Tuohy patent was not a pioneer, basing its findings upon a publication of prior art not brought to the attention of the courts which had previously held to the contrary. The publication is an article from the April, 1936, issue of Fortune magazine. The article does recite that corneal contact lenses were known before the time of the Tuohy patent, but we do not read the article as negating the novelty of Tuohy's invention. The opinions in both *Pacific Contact Labs, Inc.*, and *Solex, Labs, Inc.*, supra, reveal that much consideration was given to the existence of prior art. The evidentiary material in those cases was detailed, complicated, and technical, while the Fortune article, worthy for its enlightenment of lay readers, is comparatively superficial.[1] It is emphasized in the findings that the Butterfield patent was not involved in the prior litigation in which two courts determined that Tuohy was pioneer. This would not seem to be significant, since the issuance of Butterfield's patent followed the grant of Tuohy's and could not have affected the validity of the Tuohy patent, or, of itself, prevented the determination that Tuohy was pioneer.

Having erroneously determined that the Tuohy patent was not pioneer and thus not subject to the requirement that it be accorded a liberal interpretation, the District Court went on, in its eleventh conclusion, to hold,

> "Plastic is estopped to assert that the Butterfield lens is covered by any claim of the Tuohy patent by the rule of patent construction, often referred to as 'File Wrapper Estoppel,' that a claim in a patent must be read and interpreted with reference to claims that have been cancelled or rejected."[2]

---

1. It is interesting to note that some of the same counsel representing the parties challenging the validity of the Tuohy patent in the prior cases are, here again, challenging its scope. In Solex Labs, Inc. v. Graham, supra, the court commented,
> "Some of the same counsel who represented the infringer in the Pacific Contact Laboratories, Inc., v. Solex Laboratories case appear for the defendants in this case and contend that not all the prior art was brought to the attention of the Court in that case. * * * These omissions from the briefs in the earlier case were unimportant for the newly cited art does not add anything of worth to defendants' case. * * * Not one of the cited examples of prior art teaches a radius of curvature on its concave side slightly greater than the

radius of curvature of the cornea to which it is applied so that radially from the center of the lens there will be a small but gradually increasing clearance for the entry of natural eye fluids between the lens and the cornea. * * * This was new in the contact lens art and the discovery of how to accomplish it was invention."
Solex Labs, Inc. v. Graham, supra, 165 F.Supp. at 433–434.

2. The conclusion followed the court's Finding of Fact No. 12(a), which reads,
> "(a) The file wrapper of the Tuohy Patent, Ex. 113, discloses that patentee Tuohy surrendered broader claims in order to obtain allowance of the two claims which matured as the claims of his patent, and therefore Plastic is estopped to assert for the Tuohy Patent any broader

Applied to the facts of this case, the conclusion is erroneous. Touhy, in its application, abandoned no claims which were later successfully presented by Butterfield, the junior patentee. As we have previously noted, certain of the original Butterfield claims were rejected because of the prior grant to Tuohy and were abandoned. Of course, the principle of file wrapper estoppel is applicable in interpreting the scope of the Tuohy patent or any other, but it could not here be invoked to bar a contention by Plastic that its Tuohy patent covered the lenses being manufactured under licenses granted by Butterfield.[3]

We must assume that the District Court's careful recordation of its determinations in the particulars just discussed are indicative of belief that they were required as predicate for the determinations made in favor of Butterfield as to its claims of unfair competition and violation of antitrust laws. The findings and conclusions pertaining to the relative scope and effect of the two patents are clearly seen as having been influential to the court, and we see the errors which we have already discussed as having contaminated other findings and conclusions leading to the judgment under attack.

While the long history of frequent litigation centered upon claims relating to the two patents was not improperly heard by the court below, the ultimate issues which were presented in Butterfield's complaint were limited to issues not of patent law but of law pertaining to the charges that Plastic had unfairly competed, had tortiously interfered with Butterfield's contractual relationships, and had infringed upon federal prohibitions against certain trust activities. Disregarding the findings and conclusions which are erroneous or not germane, our examination of the record compels the conclusion that the evidence does not support the judgment against Plastic and that, also, it would not have supported a judgment against Butterfield on Plastic's counterclaim.

Plastic had entered into contracts with numerous licensees. As consideration for its grants of the licenses, the contracts provided that the licensees were to pay royalties, the amounts of which were to be measured by the amount of the total sales of contact lenses by each particular licensee.[4] A number of the conclusions and findings of the trial court relates to its determination that Plastic, in enforcing its standard royalty agreements,

---

scope than is defined by the two claims of the patent."

Factors which would necessarily require consideration in the ascertainment of the scope of the patent are the claims, both surrendered and matured, and the pioneer classification.

3. The District Court correctly held that Plastic is estopped from challenging the validity of the Butterfield patent. This is so because Plastic is a licensee and licensees may not attack the validity of the licensor's patent. IV Walker, Patents § 403 (2d Deller ed. 1965). However, the court erred when it went on, in its conclusions, to hold that Plastic is also estopped to challenge the operative effect or utility of the Butterfield patent. The law is quite clear that while a licensee cannot attack the validity of the patent, he is free to attack its scope. Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316 (1924). Let us assume that a manufacturer is a licensee of a patent under which he makes refrigerators. The same manufacturer also makes stoves, and the owner of the patent, contending that the refrigerator patent also covers stoves, claims a royalty on all the stoves manufactured. Surely the manufacturer should not be estopped to challenge the asserted scope of the patent. We notice that one of the reasons the court expressed in its conclusion that Plastic should be so estopped is that it is a licensee of the Butterfield patent. Yet, Butterfield was not held similarly estopped from attacking the operative effect or utility of the Tuohy patent even though the settlement agreement gave Butterfield the right to grant a number of licenses under the Tuohy patent.

4. Each agreement provided,
"2(a) LICENSEE, solely for the purpose of accounting hereunder, agrees to pay to LICENSOR royalties upon all devices consisting of pieces of finished material in which two lens surfaces are applied thereto and which are adapted to be or are made into a finished or unfinished corneal lens calculated in accordance with

engaged in competition which was unfair to Butterfield and which violated federal antitrust laws.

The court determined that the royalty agreement covered only those devices which were made under the teachings of the Tuohy patent and that Plastic, by collecting royalties on all devices, rather than merely those made under Tuohy teachings, unfairly competed and violated prohibitions of the antitrust laws. The court stated in its findings that it construed the agreement narrowly so that it might be held valid as written even though, according to the court, it was invalid as enforced. The court found no vice in one form of an agreement enforced by Butterfield, calculating the consideration paid by the licensee upon the basis of all the licensee's sales during the twelve-month period immediately preceding the date of the licensing agreement. It must be assumed that none of these devices, sold in advance of acquisition of a Butterfield license, were constructed under the Butterfield teachings. While ruling that Plastic had produced no evidence to support its claim that its method of royalty determination was to accomplish simplified accounting, the court accepted Butterfield's position that its royalty scheme was conceived and applied for that purpose.

The Plastic agreement calls for royalties measured by current sales rather than by past sales. Such an agreement was upheld by the Supreme Court in Automatic Radio Mfg. Co. v. Hazeltine Research Co., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). Butterfield's attempts to distinguish this case are not persuasive.[5] Our construction of the decision leads us to the conclusion that there was error in the interpretation of the Plastic licensing agreement and in the decision that Plastic's collections under the royalty provision were illegal.[6]

Another of Butterfield's claims of unfair competition pertains to the alleged misrepresentation by Plastic, through the use of circulars, letters, and other methods of dissemination, of the operative nature of the Butterfield patent and the scope and effect of the consent judgment and settlement agreement in the prior action between the parties. Butterfield alleges that the purpose of the claimed misrepresentation was to induce others not to deal with Butterfield.

Generally, Plastic's alleged wrong was the distribution of information as to its point of view of the settlement. On October 25, 1962, it sent to all of its licensees a form letter which purported to explain the settlement which had been accomplished in the preceding April. The court conceded that a primary reason for the letter may have been to explain to these licensees the reasons for permitting Butterfield to grant the four Tuohy licenses and their possible effect on other outstanding licensees to employ the Tuohy teachings. At the same time, it was found that the letter contained actionable misrepresentations. Among these was the representation that Butterfield and Plastic had "recently" settled their dispute. This was untrue because, wrote the court, "In fact this settlement had

the following schedule on all such devices sold by LICENSEE:
$1.00 on each pair of the first 150,000 pairs of devices or $ .50 per device.
$ .75 on each pair of the next 100,000 pairs of devices or $ .375 per device.
$ .50 on each pair of the next 100,000 pairs of devices or $ .25 per device.
$ .25 on each pair of all additional pairs of devices or $ .125 per device."

5. In addition to the method of royalty calculation described above, Butterfield has granted royalty agreements requiring the payment of a fixed amount each month. This provision, too, is without regard to whether any devices are made by the licensee under the teachings of the Butterfield patent.

6. Plastic makes the further contention that since it was enforcing the disputed royalty agreement at the time of the settlement and consent judgment, the question should be held to have been resolved. Because we hold that the agreement and its enforcement were not illegal, we do not reach that issue.

been made more than six months before in April of 1962." We see no solid basis for finding that a reference to a matter six months old as "recent" is actionable misrepresentation, and we see no showing of how such a "misrepresentation" could have injured Butterfield.

The court emphasized that while Plastic represented that it had been released "from all claims alleging infringement of the Butterfield Patent", it did not further state that Solex had been determined to have infringed the Butterfield patent. We cannot see that Butterfield was thereby injured or even that omitting to advise that a predecessor had infringed the patent could be characterized as misrepresentation. Other facts omitted from the distributed information are mentioned, and the court found, "To a trade, then under active solicitation by Butterfield the omissions of these material facts could not have resulted in anything except severe detriment to Butterfield in his solicitation efforts." We construe this ruling to mean that the court felt obliged to conclude, as a matter of law, that *any* detriment to Butterfield would necessarily be *severe*. We disagree. Furthermore, nothing prevented Butterfield from circulating his own version of the settlement agreement, and it is indicated that he did this to a limited extent.

The court found that Plastic "assumed the burden of explaining the settlement and did so in a manner which could only have been detrimental to Butterfield." We are aware of no requirement that a competitor shall affirmatively present his competition's view of the import of an event. It is perfectly understandable that Plastic wished to avoid discontent among its existing licensees. Butterfield could have reached the same people, and, the trial court indicated, it did circulate its own version of the settlement agreement. The identities of potential licensees in the business were not secret. The trial court mentions the number of people in the business, referring to a partial list of them. All were subject to the reach of Butterfield, as well as of Plastic.

There is similar inconsistency in Butterfield's challenge of the indemnity agreement which Plastic offered its licensees. The District Court found that this, too, constituted sufficient evidence of unfair competition. The finding can hardly be reconciled with the court's observations, without a finding of fault, that in the past Butterfield itself had indemnified several of its licensees against liability arising from any claims of infringement of the Tuohy patent. Throughout the record, it is seen that Butterfield has committed many of the same acts which, committed by his competitor, he charges as unfair competition.

The crucial part of the indemnity agreement offered by Plastic provides, "Licensor shall indemnify Licensee, * * against any and all claims for infringement under Butterfield U.S. Patent No. 2,544,246 with respect to devices sold by Licensee * * *."

In reviewing the record, one is struck by the similarity of the inventions taught by the two patents. One undertaking to construct a device under the teachings of the one patent, because of variations in the curvature of human eyes and the close precision required, confronted almost certain risks of infringing the other patent. It was inevitable, as the history reveals, that licensees of Butterfield would be exposed to claims of infringement of the Tuohy patent and that licensees of Plastic would be charged with trespass upon the rights of Butterfield. These realities created adequate and legitimate justification for the desirability, if not the necessity, on the part of each patent holder to offer indemnity agreements to its licensees.

Assuming that one's offer of indemnity agreements may be attended by circumstances supporting a determination of his wrongful and unfairly competitive purpose, the offers of Plastic here, and of Butterfield also, were so clearly induced by a legitimate business

motive that there is insufficient support for the determination that Plastic's overtures to its licensees were inspired by actionably wrongful intent and purpose.[7]

Finally, we consider Butterfield's complaint and the determination that Plastic unfairly competed through instituting litigation against its own licensees which libeled Butterfield and his attorneys and frightened the licensees from dealing with Butterfield.

■ One purpose of these actions was to recover unpaid royalties alleged by Plastic to be due under the royalty agreements. As an extension of its narrow interpretation of the Plastic royalty agreement and its determination that Plastic improperly applied the royalty provisions by attempting to collect for all devices made by its licensees, the trial court held the suits to be wrongful. We have already expressed our view that the broad royalty provisions and the manner of their application were legally permissible. Furthermore, nothing in the record indicates that the claims for unpaid royalties in the suits were not made in good faith.[8]

■ Another aspect of Plastic's suits was its charge that the defaulting licensees, together with Butterfield and Mason, one of Butterfield's attorneys, conspired to damage and injure the Plastic licensing system. None of these suits ended successfully for Plastic. That does not mean that the suits were wholly groundless, as the trial court found, or that they were coercive or unfair to Butterfield, just as an unsuccessful criminal prosecution does not, simply because it is unsuccessful, create liability for malicious prosecution. Conspiracy involves a rather sophisticated undertaking. Steps are generally taken to cover tracks. See Esco Corp. v. United States, 340 F.2d 1000, 1006 (9th Cir. 1965). Plastic knew that Mason had represented parties unsuccessful in their attacks upon the validity of the Tuohy patent in the cases previously cited, Pacific Contact Labs, Inc. v. Solex Labs, Inc., supra, and Solex Labs, Inc. v. Graham, supra. Mason had also represented several of the parties defendant in those actions filed by Plastic which are claimed by Butterfield to have been wrongfully coercive. Mason also represents Butterfield. There was no direct connection between the parties defendant and Butterfield other than as revealed by attempts of Butterfield in some instances to enter into license agreements with them; nevertheless, the circumstances,

7. Butterfield includes in the appendix to his brief a letter, which was before the court below. The letter is characterized as "typical correspondence." It was received by Plastic from one of its licensees. It cannot be considered as "typical" of correspondence pertaining to the effect of the indemnity agreement, since this licensee had not been a party to such an agreement. Butterfield had filed an infringement suit against the licensee, Rich-Tint, and a consent judgment was entered prior to the time that Plastic had made the indemnity offer. The licensee informed Plastic that it was financially unable to undertake the defense of the infringement suit and had entered into a licensing agreement with Butterfield at a cost to it of $50.00 per month for the remaining life of the Butterfield patent. The licensee requested, in its letter, that Plastic do for it retroactively what it offered to do for other licensees prospectively. It asked that it be allowed to deduct the amount of the Butterfield royalty from the amount due Plastic for royalties.

We do not read this letter, "typical" or not, as supporting Butterfield's position. It reveals that Butterfield had filed an infringement action against a small manufacturer who, unable to afford the cost of defending the suit, purchased a Butterfield license, the amount of the royalty to be paid without regard to whether it constructed any devices under the teaching of the Butterfield patent. We cannot know whether Rich-Tint was infringing or whether it ever made a device comporting with the Butterfield teaching. But we can see that Plastic, to prevent burden to its licensees in confronting similar claims, had ample justification for its offers of indemnity.

8. One of the parties sued, Hunt, was also sued by Butterfield for unpaid royalties under a licensing agreement between Hunt and Butterfield.

as could be seen by Plastic in advance of plenary determination, were sufficient to prevent a valid finding that Plastic's suits were instituted in bad faith or that they were "groundless".

 The District Court concluded that "The litigation previously described was wholly groundless and, in view of its coordination with the other activities of Plastic in these Findings described, was brought for the wrongful purpose and effect of inducing persons in the trade not to deal with Butterfield." This conclusion was drawn, expressly, "in view" of Plastic's "other activities," and we do not, in the light of the whole evidence, see that these "other activities" were illegal. Reviewing them specifically, we do not believe that it is supportable to conclude that the broad royalty base was unlawful, that the disclosures with regard to the settlement agreement were actionable misrepresentation, that the indemnity agreements involved constituted a method of unfair competition, or that it was wrongful for Plastic to communicate its view that a patent twice held to be a "pioneer" was a pioneer and, thus, had a broad scope. We recognize that a series of lawsuits, wrongfully instituted for oppressive purpose, may constitute the basis for a just charge of unfair competitive activity. See Callman, Unfair Competition and Trademarks § 8.1d, p. 139 (2d ed. 1950). But see Frolich v. Miles Labs, Inc., 316 F.2d 87 (9th Cir.), cert. denied, 375 U.S. 825, 84 S.Ct. 66, 11 L.Ed.2d 58 (1963). Here, however, the evidence is insufficient to support Butterfield's contention for the application of that rule.

All of the foregoing leads to the conclusion that we, from the entire evidence, are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The case was carefully tried, and it is plain that there was a full production of evidence.[9] We see no substantial reason for imposing further burdens upon the parties and upon the court. The judgment against Plastic is reversed. Upon remand, the complaint will be dismissed, and, with it, also falls the counterclaim.

Reversed with directions.

9. Butterfield complains that Plastic is shutting him out, yet the trial court observed that there are some three hundred manufacturers of plastic contact lenses in the United States. Plastic has licensed about one-half this number. At the time of trial, Butterfield had only solicited about fifty of these, of which twenty-three had purchased licenses from him. During the period following the 1962 settlement and before the trial of the present case, Butterfield nearly doubled his number of licensees.